IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MARK WEAVER,<br>                Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br>                Defendant. | CV. 06-6257-KI<br><br><br>OPINION AND<br>ORDER |

KING, District Judge:

INTRODUCTION

Plaintiff Mark Weaver brings this action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Social Security disability insurance benefits ("DIB") under Title II. This court has jurisdiction under 42 U.S.C. § 405(g). For the reasons set forth below, this case is remanded for the calculation and award of benefits.

BACKGROUND

Weaver was 46 years old at the time of the hearing. He completed high school. He has

worked consistently in a lumber mill warehouse in different positions that included banding, stenciling, fork lift operations, and general warehouse labor. Tr. 581.[1] He last worked in April 2003. He meets the insured status requirements for DIB through December 31, 2007.

Weaver alleges disability based on a neck fusion causing chronic pain in his neck, left shoulder and arm, chronic headaches, and numbness in his left and right hands. Tr. 67, 108. He claims the ongoing effects of his neck fusion causes the following symptoms: severe pain in his head, shoulder, arm and neck, and numbness. He claims that exertion or mobility exacerbate his symptoms. Tr. 108. At various times, Weaver was diagnosed with pancreatitis, degenerative disk disease, cervical spondylosis, myelopathy, herniated disks, torticolis, chronic cervical strain, possible radiculopathy, neuropathy in his hands, carpal tunnel disease, hypertension, hyperlipidimia, and depression. He testified that he does not think he could work anymore because of pain, headaches after working for an hour at a computer, inability to sit for very long, lack of concentration, lack of coordination, numbness in his left arm and both hands, and the need to lie down and rest on a regular basis. Tr. 570.

Weaver filed an application for DIB on July 29, 2003, alleging disability beginning April 22, 2003. The application was denied initially and upon reconsideration. On January 23, 2006, a hearing was held before an Administrative Law Judge ("ALJ"). In a decision dated March 29, 2006, the ALJ found Weaver not disabled and therefore not entitled to benefits. On August 18, 2006, the Appeals Council denied Weaver's request for review, making the ALJ's decision the final decision of the Commissioner.

---

[1] Citations are to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

## STANDARDS

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c (a)(3)(A). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.),

cert. denied, 531 U.S. 1038 (2000). "The proper course, except in rare circumstances, is to remand to the agency for further investigation or explanation." Moisa v. Barnhart, 367 F.3d 882, 886-87 (9th Cir. 2004), citing INS v. Ventura, 537 U.S. 12, 16 (2002) (per curiam).

MEDICAL RECORDS

The medical records accurately set forth Weaver's medical history as it relates to his claims. The court has carefully reviewed all the records, and the parties are familiar with them. Accordingly, only a brief summary appears below.

Weaver's history of back and neck pain dates back to October 1985 when he was treated for upper back and neck pain as a result of his job at Roseburg Lumber. Tr. 394. Weaver had an on-the-job injury in September 1991: he slipped while carrying a roll of strapping and his neck and left arm were wrenched, causing pain in his neck and left shoulder area. Tr. 347. He continued to have pain from this injury for over a year. Tr. 343-44. He reported tingling in his fourth and fifth fingers bilaterally. Tr. 341-42. An MRI of the shoulder in February 199 showed supraspinatus tendonitis or rotator cuff tendinitis. Tr. 340. In February 1993, he received cortisone injections in his shoulder for pain relief after other medications did not work. Tr. 342. He also had a course of physical therapy for this injury. Tr. 351. In March 1993, he complained of ongoing pain in his left shoulder and neck, headaches, and numbness at night in his fourth and fifth fingers on the left. Tr. 330. At that examination, he was diagnosed with a left shoulder/arm traction injury with myofascial pain and left shoulder impingement syndrome with rotator cuff tendinitis, unrelated bilateral carpal tunnel syndrome, and unrelated left ulnar neuropathy, suspected. Tr. 333. The doctor found Weaver's complaints were not disproportionate to his objective findings. Id. In May 1993, he received cortisone injections which did not alleviate his

Page 4 - FINDINGS AND RECOMMENDATION

pain. Tr. 3884-86. In June 1993, he reported difficulty sleeping and intermittent numbness at night. Tr. 384. In July 1993, he was diagnosed with chronic impingement symptoms of the left shoulder and a left acromioplasty[2] and subacromial bursectomy[3] was performed. Tr. 349-40. Weaver improved post-surgery and was found medically stationary in October 1993. Tr. 373.

In March 2001, a cervical MRI was done to address severe neck pain and the impression was degenerative changes at C5-C6 and C6-C7, and disk material extending prominently to the left at C5-C6. Tr. 503. In April 2001, Weaver continued to have pain across his shoulders, down his arms, and numbness at night into the fourth and fifth digits on both hands. Tr. 245. He was diagnosed with cervical spondylosis with myelopathy and by December 2001, his recurrent neck and arm pain was treated surgically with a C5-C6 and C6-C7 anterior cervical diskectomy and fusion with cadaveric arthrodesis and internal fixation. Tr. 127. The surgery was successful according to medical tests, but Weaver continued to have neck pain from January 2002 onward. Tr. 240. X-rays and MRIs did not have medically significant findings post-surgery to account for Weaver's neck and arm pain, and numbness in his hands. Tr. 129 (x-ray in February 2002); Tr. 499 (MRI of cervical spine in March 2002); Tr. 323-24, 497-98 (x-ray and MRI in June 2002). From August to December 2002, Weaver participated in physical therapy with little effect. Tr. 132-236. In January 2003, Weaver had nerve block injections into trigger points for pain control which were not successful. Tr. 304-06. In January 2003, he was referred to Dr. Steven Goodwin

---

[2] Acromioplasty is surgical removal of an anterior spur of the acromion to relieve mechanical compression of the rotator cuff.

[3] A bursectomy is the excision of a bursa, a sac or saclike bodily cavity, especially one containing a viscous lubricating fluid and located between a tendon and a bone or at points of friction between moving structures.

Page 5 - FINDINGS AND RECOMMENDATION

who did not find neurological reasons for Weaver's pain. Tr. 238-39. Weaver continued working and used medication to treat his pain. In April 2003, Weaver was referred to Dr. Allen Goodwin for pain management who diagnosed a possible radiculopathy in the left upper extremity and recommended epidural injections to treat his pain. Tr. 255-57, 266-67. The epidurals helped Weaver's pain a little but he continued to have pain mostly on the left side. Tr. 254. Dr. Allen Goodwin then recommended a trial of nortriptyline. Id. Weaver continued to treat his pain with medication, and was taken off work for two months, from the end of August to the end of November 2003. Tr. 289-91.

In September and December 2003, DDS reviewing physicians assessed Weaver as being able to perform light work as specified by the ALJ in his RFC determination. Tr. 276-81.

In October 2003, Dr. Allen Goodwin recommended a trial of TENS[4] to treat Weaver's pain. Tr. 391-92. Weaver was taken off work from the end of October to the end of November 2003. Tr. 288. In November 2003, Weaver's treating physician, a family nurse practitioner ("FNP"), opined that he was disabled due to chronic cervical strain, and that work made his pain more severe. Tr. 285-86. In December 2003, Weaver complained that computer work caused severe headaches. Tr. 410. He continued to use medication to treat his pain.

In 2005, Weaver was diagnosed with depression. Tr. 419. In October 2005, Weaver's FNP and Dr. Black of the same practice group opined that he was disabled. Tr. 423-26. In October 2005, Weaver tried Lexapro to treat his depression, and Lunesta to treat his insomnia. Tr. 511. In December 2005, Dr. Truhn performed a comprehensive psychological evaluation of

---

[4] TENS is the abbreviation for transcutaneous electric nerve stimulation, a technique in which mild electric currents are applied to some areas of the skin by a small power pack connected to two electrodes.

Weaver and diagnosed a major depressive disorder, and a personality disorder NOS. Tr. 525. Dr. Truhn also filled out a form entitled "Mental Residual Function Capacity Report" and found Weaver had a number of moderate limitations and also marked limitations in his ability to understand and remember short and simple instructions, ability to understand and remember detailed instructions, ability to carry out short and simple instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance and be punctual, and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. Tr. 529-30.

In April 2006, post-hearing testing showed mild carpal tunnel disease. Tr. 532. A CT of the cervical spine showed some degenerative changes and severe narrowing at C3-C4 due to facet hypertrophic changes with likely compression of the exiting nerve root. Tr. 544-45.

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999):

Step One. The ALJ determines whether claimant is engaged in substantial gainful activity. If so, claimant is not disabled. If claimant is not engaged in substantial gainful activity, the ALJ proceeds to evaluate claimant's case under step two. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Step Two. The ALJ determines whether claimant has one or more severe impairments

Page 7 - FINDINGS AND RECOMMENDATION

significantly limiting him from performing basic work activities. If not, the claimant is not disabled. If claimant has a severe impairment, the Commissioner proceeds to evaluate claimant's case under step three. 20 C.F.R. §§ 404.1520(c), 416.920(c).

Step Three. The ALJ next determines whether claimant's impairment "meets or equals" one of the impairments listed in the Social Security Administration ("SSA") regulations found at 20 C.F.R. Part 404, Subpart P, Appendix 1. If so, claimant is disabled. If claimant's impairment does not meet or equal one listed in the regulations, the ALJ's evaluation of claimant's case proceeds under step four. 20 C.F.R. §§ 404.1520(d), 416.920(d).

Step Four. The ALJ determines whether claimant has sufficient residual functional capacity ("RFC") despite the impairment or various impairments to perform work he or she has done in the past. If so, claimant is not disabled. If claimant demonstrates he or she cannot do work performed in the past, the ALJ's evaluation of claimant's case proceeds under step five. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Step Five. The ALJ determines whether claimant is able to do any other work. If not, claimant is disabled. If the ALJ finds claimant is able to do other work, the ALJ must show a significant number of jobs exist in the national economy that claimant can do. The ALJ may satisfy this burden through the testimony of a vocational expert ("VE") or by reference to the Medical-Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2. If the ALJ demonstrates a significant number of jobs exist in the national economy that claimant can do, claimant is not disabled. If the ALJ does not meet this burden, claimant is disabled. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

At steps one through four, the burden of proof is on the claimant. Tackett, 180 F.3d at

1098. At step five, the burden shifts to the ALJ to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

## THE ALJ'S FINDINGS

At step one, the ALJ found that Weaver had not engaged in substantial gainful activity at any time since the alleged onset date. Tr. 17. This finding is not in dispute. At step two, the ALJ found that Weaver had the following severe impairments: depression, headaches, and chronic pain status post cervical fusion. Id. This finding is not in dispute. At step three, the ALJ found that none of Weaver's impairments met or equaled a listing. Tr. 18. This finding is not in dispute.

In determining residual functional capacity ("RFC"), the ALJ found that Weaver had the capacity to perform a light level of physical exertion. Tr. 19. The ALJ found that Weaver could: lift and carry twenty pounds occasionally and ten pounds frequently; sit for six hours during an eight-hour workday; stand or walk for six hours in an eight-hour workday; occasionally climb ladders, scaffolds, and ropes, and to crouch and crawl; that he was limited in his ability to reach in all directions; and limited to simple tasks. Tr. 20-21. This finding is in dispute.

At step four, the ALJ found that Weaver was unable to perform his past relevant work. Tr. 21. This finding is not in dispute. At step five, utilizing the testimony of a vocational expert ("VE"), the ALJ found that Weaver could perform the jobs of stenciler and work ticket distributor as light work, and the jobs of surveillance system monitor, eye glass polisher, and document preparer as sedentary work. Tr. 22-23. This finding is in dispute.

## DISCUSSION

Weaver contends that the ALJ erred by: (1) failing to give clear and convincing reasons

Page 9 - FINDINGS AND RECOMMENDATION

for rejecting the medical opinion of Dr. Truhn; (2) improperly rejecting Weaver's testimony; (3) failing to address the opinion of Ms. Hansen, FNP; and (4) improperly concluding that Weaver can perform other work in the national economy at step four. Because the first two arguments are dispositive, the remaining arguments need not be addressed.

Medical Opinion of David Truhn, Psy. D.

Weaver contends the ALJ failed to give clear and convincing reasons for not crediting the opinion of Dr. Truhn, the examining psychologist. The opinion of an examining physician is not entitled to the same weight as the opinion of a treating physician, but is entitled to greater weight than the opinion of a non-examining or reviewing physician. See Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. Id. However, even if contradicted by another doctor, the opinion of an examining doctor can only be rejected for "specific and legitimate reasons that supported by substantial evidence in the record." Id. at 830-31.

In his report, Dr. Truhn identified marked mental limitations that precluded competitive work, according to the testimony of the VE. Tr. 529-30 (Dr. Truhn's assessment of marked limitations in several areas); Tr. 585-86 (VE's testimony). Dr. Truhn also stated that there was a strong possibility that motivational issues such as pain could have interfered with Weaver's abilities on sustained tasks during testing, and also affected his concentration and attention. Tr. 522-23. Dr. Truhn also opined that Weaver would "experience increased depression and problems with attention and concentration if he attempted to engage in employment." Tr. 527.

The ALJ relied on Dr. Truhn's evaluation to find that Weaver's depression was a severe impairment. However, in assessing Weaver's depression under the listing requirements for

Page 10 - FINDINGS AND RECOMMENDATION

depression, the ALJ went on to find that Weaver had only mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence and pace. Tr. 19. This finding directly contradicts Dr. Truhn's opinion that Weaver had marked limitations in maintaining attention and concentration for extended periods. Tr. 530. The ALJ also relied on Dr. Truhn's report to find that Weaver was limited to simple tasks due to a combination of depression, pain and headaches. Tr. 19. This finding contradicts Dr. Truhn's opinion that Weaver would have marked limitations in understanding, remembering and carrying out short and simple instructions. Tr. 529-30. With regard to Dr. Truhn's report, the ALJ noted that the report indicated a "poor prognosis" due to a deteriorating social support network since the departure of Weaver's wife, and that Dr. Truhn concluded that the Weaver's psychological stability was deteriorating also. Tr. 21. However, the ALJ never provided any reasons for discrediting the remainder of Dr. Truhn's report nor his Mental Residual Function Capacity Assessment, nor did he point to any evidence in the record that contradicted Dr. Truhn's findings. Because Dr. Truhn's opinion was uncontradicted, the ALJ was required to provide clear and convincing reasons for rejecting his opinion. See Lester, 81 F.3d at 830.

The Commissioner's argument that the ALJ provided sufficient reasons for accepting some of Dr. Truhn's limitations but rejecting others is not well taken. First, the Commissioner presents several arguments which the ALJ did not mention in his opinion and certainly did not rely on in discrediting Dr. Truhn, including that Dr. Truhn was not a treating physician, that Weaver never sought or received psychological counseling, and a mis-quotation of Dr. Truhn's statement that Weaver's tendency to minimize psychological problems might be exacerbating his

Page 11 - FINDINGS AND RECOMMENDATION

medical complaints. These and other citations to the record by the Commissioner are no more than post hoc rationalizations for the ALJ's failure to properly consider Dr. Truhn's opinion. See SEC v. Chenery Corp., 334 U.S. 194, 196-97 (1947) (a court may not accept counsel's post hoc rationalizations for agency actions).

Because the ALJ failed to provide adequate reasons for rejecting Dr. Truhn's opinion, this court credits that opinion as a matter of law. Lester, 81 F.3d at 834. Dr. Truhn's opinion and the limitations he assessed based on depression establish that Weaver meets the "B" criteria of the listing for affective disorders at § 12.04 and is disabled. See 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Weaver's Testimony and Credibility

Weaver contends the ALJ improperly rejected his testimony. If there is medical evidence of an underlying impairment, the ALJ may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). "Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'" Lester, 81 F.3d at 834 (citation omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id. In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

The record showed no evidence that Weaver was malingering, and medical evidence does

show that Weaver had legitimate impairments including chronic pain status post cervical fusion, headaches, and depression which the ALJ found to be severe impairments. Weaver alleges that he also suffers from degenerative disc disease of the thoracic spine, a personality disorder, and carpal tunnel syndrome.

Weaver testified that he spends his days mostly in a recliner and watches television. Tr. 562. He reported that he has to lie down every one to two hours because of headaches. Tr. 558. He reported that he can only sleep for about an hour to an hour and a half at night due to pain. Tr. 561. He reported that if he engaged in any activity for very long, he gets headaches, pain down to his shoulder, and his arms go numb. Tr. 562. He reported that he is no longer able to hunt, fish or run his jet boat which he has sold. Tr. 562-63. He reported that he used to raise dogs but could no longer care for them, and that his wife took the dogs when she left him. Tr. 567. He reported he has headaches off and on constantly, all day, and that he has to lie down two or three times per day to get relief from the headaches. Tr. 563. Weaver testified that his wife did all of the household chores until she left him, and that he then relied on his mother to help with the cooking, laundry, grocery shopping and cleaning. Tr. 565-66. He reported that he rents property that does not require any maintenance, that his heat comes from oil and wood heat, and that a neighbor splits all the wood he requires for heating his home. Tr. 567. He reported that he was only able to do a task like vacuuming for five or ten minutes before he would be in pain or get a headache. Tr. 566. He reported that he has no coordination and no feeling in his hands quite a bit of the time, and that he drops things he picks up. Tr. 572. He reported that he hardly leaves his home, he does not drive much because it causes him pain, and that his father drives when he must travel any distance, such as to his hearing that day. Tr. 575.

The ALJ discredited Weaver's subjective complaints and limitations, and found that they were not supported by the weight of the evidence. This court disagrees with the ALJ's credibility finding. With regard to Weaver's allegation that he suffers from a severe limitation in the use of his hands, the ALJ found that this condition was not reported to nor commented on by treating sources. Tr. 20. However, the record shows that Weaver reported weakness and numbness in his arms and hands to medical professionals on numerous occasions. See, e.g., Tr. 245 (April 2001); Tr. 316, 317 (May 2002); Tr. 190 (October 2002); Tr. 256 (April 2003); Tr. 511 (October 2005); Tr. 534 (April 2006). Also, in January 2003, Dr. Steven Goodwin noted that sensation was diminished slightly in the fourth and fifth digits on Weaver's right hand. Tr. 239. In August 2002, he was noted to have diminished dermatomal sensation in his upper extremities. Tr. 234. In 2006, nerve conduction studies showed mild carpal tunnel disease. Tr. 531-32. Thus the record supports Weaver's testimony that he dropped things because he lacked feeling in his hands. The ALJ erred by finding otherwise.

The ALJ quoted portions of a report from Dr. Allen Goodwin to support his negative credibility determination. However, the ALJ failed to note that Dr. Allen Goodwin also diagnosed a possible radiculopathy[5] in the left upper extremity in that same report, considered that Weaver was status post C5-6 and C6-7 fusion, and proposed transforaminal epidural steroid injections (nerve blocks) to treat Weaver's chronic neck pain. Tr. 256-57. A physician's statements must be read in the context of the overall diagnostic picture he draws. Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001). Dr. Allen Goodwin's treatment of Weaver's

---

[5] Radiculopathy refers to disease of the spinal nerve roots. Radiculopathy produces pain, numbness, or weakness radiating from the spine.

cervical and shoulder pain does not negatively impact Weaver's credibility.

With regard to pain in Weaver's head, neck and back, the ALJ found that Weaver's pain complaints exceeded objective medical evidence, that Weaver failed to mention headaches in some medical reports, and that medical studies have shown that Weaver's neck fusion was solid. None of these meets the required "clear and convincing" reasons for rejecting a claimant's pain testimony. See Smolen, 80 F.3d 1273, 1281-82. The fact that a claimant's testimony is not fully corroborated by objective medical findings, in and of itself, is not clear and convincing reason for rejecting it. Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001). Also, a claimant need not submit medical evidence which supports the degree of pain. Bunnell, 947 F.2d at 347; see also Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th Cir. 1990) (claimant need not present clinical or diagnostic evidence to support the severity of his pain). No treating or examining physician ever questioned the extent of Weaver's pain following his cervical fusion, and none of his daily activities were inconsistent with the limitations he reported. Weaver tried many different therapies and medication to alleviate his pain and remained on some pain medication throughout the period in question.[6] Because the ALJ's reasons for rejecting Weaver's testimony were inadequate, that testimony is credited as a matter of law. Lester, 81 F.3d at 834 (ALJ's improper rejection of claimant's testimony must lead to crediting that testimony as a matter of law); see also Varney v. Secretary of HHS, 859 F.2d 1396, 1401 (9th Cir. 1988).

---

[6] I note that the written testimony of Dawn Weaver, Weaver's wife, supports Weaver's testimony as to his symptoms and limitations. Tr. 87-95. Although this issue was not raised by Weaver, the ALJ erred in failing to address Mrs. Weaver's testimony. See Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (lay witnesses are competent to testify as to a claimant's symptoms or how an impairment affects the ability to work and therefore "cannot be disregarded without comment").

Page 15 - FINDINGS AND RECOMMENDATION

Finally, the record contains medical evidence submitted to the Appeals Council after the ALJ's decision that supports Weaver's allegation that he is disabled based on his spinal condition. This additional evidence may be considered by this court in determining whether substantial evidence supports the ALJ's decision. Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir.), cert. denied, 531 U.S. 1038 (2000). With regard to the listing for disorders of the spine, the ALJ wrote that Weaver's degenerative disc disease of the cervical spine does not meeting a listing, as "in pertinent part, the claimant has not experienced nerve root compression or spinal arachnoiditis." Tr. 18; see 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. However, in the medical evidence Weaver submitted for review by the Appeals Council following the ALJ's decision denying benefits, a CT scan dated June 2006 of the cervical spine found the following: "Right neuroforamen at the level of C3-C4 is severely narrowed due to facet hypertrophic changes and some uncovertebral hypertrophy with likely compression of the exiting nerve root." Tr. 544-45. This new evidence undermines the ALJ's conclusion that Weaver did not meet a listing for § 1.04, disorders of the spine, based on lack of nerve root compression.

The ALJ found that depression, headaches and chronic pain status post cervical fusion were severe impairments for the purpose of determining disability. Accepting Weaver's testimony as true with regard to the limitations caused by his spinal impairments, chronic pain and depression, the record shows that he is unable to perform full-time work and is disabled.

///

///

///

///

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and remanded pursuant to sentence four of 42 U.S.C. § 405(g) for the calculation and award of benefits.

Dated this ____15th____ day of October, 2007.

                                            /s/ Garr M. King
                                            Honorable Garr King
                                            United States District Judge